# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### PINE BLUFF DIVISION

GREGORY DAVIS,
ADC #97816                                                                    PLAINTIFF


V.                                          5:10CV00271 SWW/JTR


JOHN GLASSCOCK, Lieutenant,
Arkansas Department of Correction                                      DEFENDANT

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

## INSTRUCTIONS

The following recommended disposition has been sent to United States District Judge Susan Webber Wright.  Any party may serve and file written objections to this recommendation.  Objections should be specific and should include the factual or legal basis for the objection.  If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection.  An original and one copy of your objections must be received in the office of the United States District Clerk no later than fourteen (14) days from the date of the findings and recommendations.  The copy will be furnished to the opposing party.  Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new,

different, or additional evidence, and to have a hearing for this purpose before the

United States District Judge, you must, at the same time that you file your written

objections, include a "Statement of Necessity" that sets forth the following:

1.    Why the record made before the Magistrate Judge is inadequate.

2.    Why the evidence to be proffered at the requested hearing before the United States District Judge was not offered at the hearing before the Magistrate Judge.

3.    An offer of proof setting forth the details of any testimony or other evidence (including copies of any documents) desired to be introduced at the requested hearing before the United States District Judge.

From this submission, the United States District Judge will determine the necessity

for an additional evidentiary hearing, either before the Magistrate Judge or before the

District Judge.

Mail your objections and "Statement of Necessity" to:


Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite A149
Little Rock, AR 72201-3325

## I.  Introduction

On August 31, 2010, Plaintiff, Gregory Davis, filed a *pro se* § 1983 Complaint

(docket entry #2) initiating this action.[1]  The Complaint itself did not name any Defendants or even set forth a description of the claim Plaintiff intended to assert. However, attached to the Complaint was a grievance, dated August 26, 2010, which alleged that five unnamed guards at the Tucker Maximum Security Unit ("TMSU") "brutally . . . beat me, [then] they forced me to lie unconscious in my own phesies [sic] for a week without medical attention."  The grievance did not state the date the alleged beating occurred, or identify any of the guards who allegedly participated in the beating.

The Court ordered Plaintiff to file an Amended Complaint that: (1) named the guards who personally participated in the alleged beating; and (2) set forth the specific claims Plaintiff wished to assert against those Defendants for violating his constitutional rights.  (Docket entry #4).

On October 15, 2010, Plaintiff filed an Amended Complaint.  (Docket entry #6).  Once again, he failed to name any of the five guards involved in the alleged beating.  He stated that he "didn't know the date or time they did this" and that he was a "mental health patient."  According to Plaintiff, the five guards "took me to ad seg at Tucker Max" and while he "was in handcuffs that's when they started [to] jump on me and left me in my feces for a hole [sic] week before I got some medical attention

---

[1]At the time he filed this action, Plaintiff was incarcerated in the Cummins Unit.

3

. . . . They beat me about four or five hours."  Ray Hobbs, the Director of the ADC, was the only Defendant named in the Amended Complaint.

On November 22, 2010, the Court entered an Order dismissing Ray Hobbs, who as Director of the ADC was *not* alleged to have had any knowledge of or involvement in the use of excessive force by the five unnamed guards at TMSU.  (Docket entry #10).  The Court allowed Plaintiff 120 days to provide the names of the five "John Doe Defendants" who allegedly beat him.

On April 6, 2011, Plaintiff filed a Motion for Extension of Time (docket entry #19) in which he requested an additional thirty days to identify the John Doe Defendants.  In support of this request, Plaintiff cited his need to review his medical records.  Then, without any explanation, Plaintiff named "Lieutenant Glasscock" as one of the guards who beat him.

On April 19, 2011, the Court entered an Order allowing Plaintiff the requested thirty-day extension.  (Docket entry #22).  The Court also ordered service of Plaintiff's Complaint, Amended Complaint, and all other motions and Orders on Defendant John Glasscock.

On June 10, 2011, Defendant Glasscock filed a *pro se* Answer denying all of

the allegations in Plaintiff's Amended Complaint.[2]  (Docket entry #34).  Defendant

Glasscock did *not* raise failure to exhaust as an affirmative defense.

On July 11, 2011, Plaintiff filed a "Motion for Production of Documents and

Service of Summons." (Docket entry #39).  He alleged that the ADC had refused to

provide him with the documents needed to identify the John Doe Defendants.

On July 20, 2011, the Court entered an Order construing Plaintiff's Motion as

a request for a subpoena duces tecum under Rule 34(c) and 45(a). (Docket entry #42).

The Court directed the Clerk to issue a subpoena requiring the Warden of TMSU to

produce to the Court: (1) any incident reports or other documents containing the

names of TMSU current or former guards involved in any incident in which they used

any force against Plaintiff while he was incarcerated in that facility; and (2) the

service addresses for the current or former guards involved in any such incident.

On August 9, 2011, William Straughn, the Warden of TMSU, responded to the

subpoena.  In a transmittal memo, he explained that he was unable to locate any

incident reports or other documents related to any use of force by TMSU guards

against Plaintiff. He stated his belief that the allegations in Plaintiff's Amended

Complaint "stem from a medical/mental health event that occurred on January 19,

---

[2]At the time he was served, Defendant Glasscock was no longer employed by the ADC.  Thus, the Arkansas Attorney General was not in a position to represent him.

2009, which resulted in the Plaintiff's hospitalization." Warden Straughn provided the Court with the incident reports prepared by the TMSU guards involved in that "medical/mental health event" and the last-known addresses where those guards could be served.[3]

On August 15, 2011, the Court entered an Order directing the Clerk to mail to Plaintiff all of the documents produced by Warden Straughn. (Docket entry #44). The Court allowed Plaintiff until September 8 to review those documents and then notify the Court of the names of any additional Defendants or of any additional claims he wanted to add to this lawsuit.[4] (Docket entry #47).

The September 8 deadline passed without Plaintiff providing the Court with the names of any new Defendants or a description of any new claims. Accordingly, on September 19, 2011, the Court entered an Order dismissing the John Doe Defendants, without prejudice. (Docket entry #50).

On January 9, 2012, the Court entered a Scheduling Order which set this case

---

[3]A copy of Warden Straughn's transmittal memo and the incident reports, marked Plaintiff's Exhibit 1, were introduced into evidence during the March 13, 2012 Evidentiary Hearing.

[4]During the March 13, 2012 Evidentiary Hearing, Plaintiff acknowledged receiving the documents produced by Warden Straughn. He testified that, after reviewing those documents, he decided not to name any additional guards as Defendants.

for an Evidentiary Hearing on March 13, 2012. (Docket entry #52).  At that time, the *only claim* Plaintiff had asserted in his Amended Complaint and other papers was that Defendant Glasscock used excessive force against him while he was incarcerated in the TMSU.

Plaintiff and Defendant Glasscock were both proceeding *pro se*.  As the date of the Evidentiary Hearing approached, the Court became concerned that the parties might not introduce into evidence all of the essential documents relevant to understanding and resolving Plaintiff's excessive force claim. Accordingly, on March 2, 2012, the Court entered an Order directing the Clerk to issue a subpoena to Danny Burl, the Warden of the East Arkansas Regional Unit.[5]  (Docket entry #59).

The subpoena directed Warden Burl to provide the Court with the following documents: (1) all medical records reflecting the treatment Plaintiff received after he was transported from the TMSU infirmary to UAMS on January 19, 2009[6]; (2) all medical records reflecting the treatment Plaintiff received from Dr. Ifedoria, in TMSU's infirmary, on January 19, 2009; and (3) all photographs that were taken of

_____

[5]By March of 2012, Plaintiff had been transferred to the East Arkansas Regional Unit.

[6]The documents produced earlier by Warden Straughn made it clear that, after the January 19, 2009 incident, Plaintiff was taken from the TMSU infirmary  to UAMS.

7

Plaintiff after the January 19, 2009 incident.[7]

On March 9, 2012 Warden Burl delivered the foregoing documents to the Court.[8]  Those medical records revealed the following:

(1) At 8:45 a.m. on January 19, 2009, a nurse was called to Plaintiff's cell in the east isolation unit because he was "nonresponsive." The nurse found Plaintiff covered in urine and feces. He was taken to the infirmary on a gurney.

(2) In January of 2009, Plaintiff was taking four medications to control his schizophrenia: (a) fluphenazine, an injectable anti-psychotic medication that he received every 28 days; (b) Haldol (daily); (c) Prolixin Decanoate (daily); and (d) Ativan (daily). The fact Plaintiff was in the east isolation unit "under observation for two weeks for mental health issues" suggests that his medications may not have been controlling his schizophrenia.

_____

[7]The Court believed the requested medical records were crucially important to resolving Plaintiff's allegation that he was brutally beaten approximately five days before he finally received medical treatment on January 19, 2009. The beating Plaintiff described in his Amended Complaint would have created numerous traumatic injuries which should have been noted by Dr. Ifedoria and the UAMS physicians who treated Plaintiff on and after January 19, 2009.

[8]During the March 13, 2012 Evidentiary Hearing, copies of those documents, marked Plaintiff's Exhibit 2, were introduced into evidence.

(3) Dr. Ifedoria examined Plaintiff at 9:04 a.m.  He noted that Plaintiff had been "under observation for 2 wks. for Mental Health issues, had not eaten for 3 days, and was uncommunicative." He was "reeking of acetone and urine." He was stuporous and not obeying commands. Dr. Ifedoria diagnosed "diabetic ketoacidosis with coma (no prior history of diabetes mellitus)" and "dehydration." He ordered "transfer urgently to UAMS via ambulance." *Importantly, Dr. Ifedoria did not note any signs of traumatic injury.*[9]

(4)  When Plaintiff arrived at UAMS, he was diagnosed to be in "septic shock."  Blood cultures revealed that he had a systemic staph infection (blood poisoning) that was gram negative.  UAMS physicians began an IV  infusion of antibiotics to save Plaintiff's life.  He was uremic due to his kidneys beginning to fail. He was intubated and placed on a ventilator in the ICU, and received several dialysis treatments.  He was described to be in a delirium for the next three weeks.   He was unconscious and unresponsive. He received a psychiatric evaluation (based on his prior medical history) and his serious long-term problem

---

[9]Dr. Ifedoria did note *superficial* abrasions, but failed to state where they were located.  Certainly, the kind of beating Plaintiff described in his Amended Complaint would have caused far more than superficial abrasions.

with schizophrenia was noted, along with the numerous medications he was taking for that problem. On February 3, 2009, Plaintiff became responsive and was able to communicate. On February 4, 2009, he was discharged from UAMS and transported to the Pine Bluff Diagnostic Unit. *Importantly, nothing in the extensive UAMS medical records suggests that any of the doctors who examined Plaintiff noted any signs of traumatic injuries or provided Plaintiff with any medical treatment for such injuries.*

Finally, on March 5, 2012, Defendant Glasscock provided the Court with a copy of the exhibits he intended to introduce into evidence at the Evidentiary Hearing. (Docket entry #65). Two of those exhibits, which were later introduced into evidence, have a direct bearing on the merits of Plaintiff's excessive force claim against Defendant Glasscock.

First, on March 5, 2009, the ADC's Internal Affairs Department issued a "Final Report" on the incident involving Plaintiff that took place between January 16-19, 2009.[10] The Report identifies Plaintiff as the "victim" and "[Defendant] Glasscock, Bobby Lunsford, and Gaylon Honea" as the "subjects" of the investigation.

---

[10]A copy of this Report, marked Plaintiff's Exhibit 3, was introduced into evidence during the Evidentiary Hearing.

*The Report sets forth the following facts, none of which were controverted by Plaintiff during the March 13, 2012 Evidentiary Hearing*:

(1)  On the evening of January 16, 2009, Plaintiff was alone in cell #1 of the east isolation unit. A guard reported to Sgt. Honea that Plaintiff had removed all of his clothing, defecated in his cell, and smeared feces all over his body. Sgt. Honea ordered the guard to take Plaintiff to the shower and clean and disinfect his cell.  It appears Plaintiff refused the guard's order to "catch the cuff" so he could be taken to the showers and his cell cleaned and disinfected.

(2)  At approximately 10:40 p.m., Sgt. Lunsford relieved Sgt. Honea. According to Sgt. Honea, he told Sgt. Lunsford about Plaintiff and the condition of his cell. He made it clear to Sgt. Lunsford that Plaintiff needed a shower and his cell needed to be cleaned and disinfected.  Sgt. Lunsford later told Defendant Glasscock about the situation involving Plaintiff and his cell.  Defendant Glasscock ordered Sgt. Lunsford to take Plaintiff to the showers and to clean and disinfect his cell.

(3) At approximately midnight on January 17, 2009, Sgt. Honea talked to Defendant Glasscock and asked him if Sgt. Lunsford had told him about Plaintiff "being in the cell naked and having feces rubbed all over

11

him." Defendant Glasscock responded that "Sgt. Lunsford had advised him and he told Lunsford to get the cell cleaned up."

(4) From at least early evening on January 16, 2009, to 8:45 a.m. on January 19, 2009, when Plaintiff was removed from his cell on a gurney, numerous guards and officers knew that: Plaintiff was naked in his cell; he had not eaten any food in several days; he was engaging in deeply psychotic behavior, which included defecating and urinating in his cell and rubbing feces all over his body; he was under observation for mental health issues; and he was taking multiple medications to control his schizophrenia. *Yet, none of the guards did what they knew had to be done to protect Plaintiff from himself and avoid exposing him to clearly unconstitutional conditions of confinement, i.e., give him a shower; clean and sanitize his cell; and take him to the infirmary and advise Dr. Ifedoria that Plaintiff was engaging in psychotic behavior.*

(5) Over the next three days, guards in the east isolation unit allowed Plaintiff to engage in dangerous psychotic behavior that posed a clear risk to his health and safety, and exposed him to clearly unconstitutional conditions of confinement. Based on these undisputed facts, it is not unreasonable to conclude that Plaintiff's subsequent staph infection,

12

which lead to septic shock, may have resulted from guards allowing him to remain in his own feces over a period of three days.

The Internal Affairs Report places primary responsibility for this incident on Sgt. Lunsford, who was terminated. The report also found Defendant Glasscock to be secondarily responsible because he failed to follow up and ensure that Sgt. Lunsford followed the orders he gave him on the evening of January 16. In a letter, dated March 17, 2009, TMSU Warden David White notified Defendant Glasscock that he was also terminated.[11]

Importantly, *nothing* in the Internal Affairs Report even remotely suggests that Plaintiff was the victim of guards using *any force* against him while he was incarcerated in the east isolation unit.

Plaintiff clearly could have asserted numerous constitutional claims against both the guards and nurses who failed to protect him and provide him with timely medical care for the dangerously psychotic behavior he engaged in from January 16 to January 19. He also could have asserted conditions of confinement claims against

---

[11]This letter, which comprises the last two pages of Plaintiff's Exhibit 3, is filled with scrivener's errors. For example, the event is incorrectly referred to as the "February 15, 2009 incident," rather than the "January 16-19 incident." The letter incorrectly states that the incident involved "Inmate Kimble," rather than "Inmate Davis." Finally, the letter finds Defendant Glasscock "quality of that violation," rather than "guilty of that violation."

the guards who exposed him to conditions that simply shock the conscience. Yet, for reasons known only to Plaintiff, he never filed any grievances raising those claims so that they could be preserved and asserted later in a § 1983 action.

When Plaintiff finally filed this action, over eighteen months after the January 16-19 incident, he attached a grievance to his Complaint that is dated August 26, 2010, and appears to raise for the first time the alleged excessive force claim that he contends took place about one week before he received medical attention on January 19, 2009. This alleged use of excessive force became the *only claim* Plaintiff ever asserted in this action and he elected to assert that claim only against Defendant Glasscock. Accordingly, that was the *only claim* properly before the Court during the March 13, 2012 Evidentiary Hearing.

## II. Findings of Fact

1.     Plaintiff testified that he believed he was attacked and beaten approximately five days before he was taken to the TMSU infirmary on the morning of January 19, 2009. He agreed that would mean the beating took place around January 14, 2009.

2.     Plaintiff stated that he was diagnosed with schizophrenia many years ago. On July 31, 1998, Plaintiff entered the ADC to serve his current sentence. At that time, doctors in the ADC's Diagnostic Unit knew that Plaintiff suffered from

14

schizophrenia and they gave him prescriptions for medications to control his condition.   He confirmed that, in January 2009, his schizophrenia was being controlled with periodic injections of fluphenazine, and he was also taking Ativan, Haldol, and Prolixin Decanoate.  *See* Pltf's Ex. 2.

3.     According to Plaintiff, on or about January 14, 2009, five guards escorted him from his cell in the TMSU to cell #1 in the east isolation unit.  His hands were cuffed behind his back.  He did not know why the guards were taking him to the east isolation unit.[12]  When he entered cell #1, one guard used a billy club to strike him in back of his head.  He fell to the floor, where the guard with the billy club continued to hit him in the head, and on his arms, shoulders, back and legs.  The other four guards used their feet to kick him all over his body.  They also repeatedly struck him with their fists.  Plaintiff described the guards as being young and strong.  He testified

---

[12]In his Amended Complaint, Plaintiff alleges that Lt. Frazier ordered the five guards to attack him.  Plaintiff stated that he had earlier filed a grievance against Lt. Frazier because he would not allow Plaintiff to go to the TMSU infirmary for chest pain.  He believed this was the reason Lt. Frazier ordered the attack.  Plaintiff admitted this was entirely his subjective opinion and he knew of no facts to support his belief that Lt. Frazier ordered the attack.   Interestingly, while Plaintiff's Amended Complaint alleged that Lt. Frazier ordered the five unnamed guards to attack him, Plaintiff did not name Lt. Frazier as a Defendant.  Rather, the only Defendant Plaintiff named in his Amended Complaint was Ray Hobbs, the Director of the ADC.

that the beating lasted for over an hour.[13]  At some point, Plaintiff stated that he lost consciousness and awoke on the floor of his cell, covered in his own feces and urine.

4.     When questioned about the Internal Affairs Report (Pltf's Ex. 3), which described how Plaintiff had voluntarily removed his clothes on January 16 and rubbed feces all over his body, Plaintiff indicated he really had no recollection of what happened during the week before he was taken to the infirmary on January 19.  He also could not explain why such a prolonged and brutal beating did *not* result in Dr. Ifedoria and the physicians at UAMS finding *any traumatic injuries* when they examined Plaintiff on January 19.

5.     Plaintiff candidly admitted that his schizophrenia caused him to sometimes have psychotic episodes in which he could not remember what happened. During these episodes, he admitted that he sometimes became delusional.  Plaintiff conceded that he may have had a psychotic episode that caused him to remove his clothes and rub feces all over himself.  He also admitted that, if this occurred, he may have become delusional and imagined that he was beaten by Defendant Glasscock and four other guards, when, in fact, no such beating actually took place.

6.     Plaintiff was asked how he was able to recall, in April of 2011, over two

----

[13]In his Amended Complaint, Plaintiff alleged the beating lasted for "four or five hours."

16

years after the January 14, 2009 beating, that Defendant Glasscock was one of the guards who participated in that beating. He stated that, in April of 2011, someone showed him a newspaper article that reported Defendant Glasscock had been terminated based on the January 16 to 19 incident. Plaintiff *assumed* Defendant Glasscock had been terminated for his role in beating him.

7. In fact, the March 5, 2009 Internal Affairs Report (Pltf's Ex. No. 3) makes it clear that Defendant Glasscock was fired because: (1) he failed to follow up and make sure that Plaintiff had been given a shower and his cell had been cleaned and disinfected during the late evening of January 16 or the early morning of January 17; and (2) he failed to protect Plaintiff from injury by getting him the medical care he needed to stop his psychotic behavior that began on January 16. Importantly, Plaintiff had no *independent recollection* of Defendant Glasscock ever using any force against him or of Defendant Glasscock actually participating in the alleged January 14 beating.

8. After Plaintiff was released from UAMS on February 4, 2009, he was taken to the Pine Bluff Diagnostic Unit for a number of months, and then to the Randall Williams Unit, where he continued to get treatment for his schizophrenia and other medical problems. According to Plaintiff, his medications for his schizophrenia were adjusted and he began to take Thorazine. Since that time, Plaintiff testified that

he has been doing much better managing his schizophrenia.   Plaintiff was subsequently transferred to a two-person cell in the Cummins Unit and then to a one-person cell in the East Arkansas Regional Unit, where he is currently incarcerated.  Plaintiff acknowledged that his schizophrenia makes it difficult for him to get along with other prisoners in a group or barracks setting.

9.   Plaintiff admitted that, after the January 2009 incident in cell #1 of the east isolation unit, he never filled any grievance asserting claims that guards and medical staff failed to protect him; exposed him to unconstitutional conditions of confinement; or provided him with inadequate medical care. He also admitted that he never attempted to raise those claims in this lawsuit.[14]

10.   With regard to his excessive force claim against Defendant Glasscock, Plaintiff admitted that he waited until August 26, 2010, over eighteen months after the alleged beating took place, before he filed a grievance.  He had no explanation for waiting so long to file a grievance and did not recall how the grievance was resolved or whether he appealed and exhausted his administrative remedies.[15]

---

[14]Plaintiff's failure to file a grievance asserting those claims against the specific guards who were involved and then exhausting his administrative remedies means that he is now barred from bringing them in a § 1983 action.  *See* 42 U.S.C. § 1997e(a). In addition, the three-year statute of limitations has now run on those claims.

[15]If Defendant Glasscock had raised Plaintiff's failure to exhaust his administrative remedies as an affirmative defense in his Answer and later filed a

11.     Defendant Glasscock testified that, at the time of the January 16-19

incident, he had worked in the TMSU for over ten years. He stated that, when the

incident took place, he did not know Plaintiff's name and had never had any contact

of any kind with him.[16] He categorically denied ever using any force against Plaintiff

and unequivocally stated that he knew nothing about anyone ever beating or using any

force against Plaintiff while he was incarcerated in the TMSU. He testified that, when

he read the allegations in Plaintiff's Amended Complaint, he had no idea what

Plaintiff was talking about.

12.     At the time of the January 16-19 incident, Defendant Glasscock held the

rank of Lieutenant.  He testified that, during his shift, he was responsible for all areas

of the facility and all sergeants throughout the TMSU reported to him.  His office was

located in the main building of the TMSU and was a considerable distance from the

east isolation unit.  Sgt. Lunsford came to his office, during the late evening hours of

January 16, and reported the situation in Plaintiff's cell.  Defendant Glasscock ordered

Sgt. Lunsford to give Plaintiff a shower and to clean and disinfect his cell.  According

to Defendant Glasscock, Sgt. Lunsford had always carried out his orders in the past,

---

properly supported Motion for Summary Judgment, it seems likely Defendant
Glasscock would have prevailed on that Motion.

[16]According to Defendant Glasscock, in January of 2009, approximately 525
prisoners were incarcerated in TMSU.

which caused him to believe he would carry out his orders regarding what needed to be done to clean up Plaintiff and his cell.  Defendant Glasscock admitted that he never followed up to ensure that Sgt. Lunsford had obeyed his orders and he never visited east isolation to personally observe Plaintiff's circumstances in cell #1.

13.    Defendant Glasscock is a very large and physically imposing man. It defies credulity to believe that he could have kicked and hit Plaintiff for over an hour without causing obvious and grievous traumatic injuries to him. This fact alone makes it impossible to believe that Plaintiff was beaten in the way he described and is compelling evidence that, as Plaintiff himself admits, he may have been delusional and imagined that Defendant Glasscock and others beat him when, in fact, no such beating ever actually occurred.

14.    Defendant Glasscock called James Gibson as a witness.  Mr. Gibson was the internal affairs investigator who investigated the January 16-19 incident and who wrote the March 5, 2009 Internal Affairs Report.[17]  Mr. Gibson testified that, during his investigation of the incident, he did not discover any evidence that anyone had used any force against Plaintiff while he was incarcerated in the east isolation unit. If he had discovered anything that suggested anyone had used force against Plaintiff, Mr. Gibson made it clear that he would have thoroughly and completely investigated

_____

[17]Mr. Gibson is currently the assistant warden at the Delta Regional Unit.

those allegations. Mr. Gibson unequivocally testified that, based on his thorough investigation of the January 16-19 incident, nothing suggested that Defendant Glasscock or any other guards ever used any force against Plaintiff.[18]

15.     The *only evidence* supporting Plaintiff's claim that Defendant Glasscock brutally beat him is his own equivocal testimony that he believes it *might* have happened. Plaintiff admits that, given the psychotic episode he was experiencing at the time of the incident, he may have been delusional and only imagined that the beating took place.

16.     *None* of the medical evidence in any way supports Plaintiff's claim that he suffered a prolonged and brutal beating administered by five strong, young guards,

---

[18]The Court finds it deeply troubling that guards and nurses working in TMSU's east isolation unit did nothing to help a mentally ill prisoner who was engaging in deeply psychotic behavior that clearly threatened his health and safety. Part of what makes this so disturbing is that, at the time the event took place, Plaintiff was in cell #1 "under observation for 2 weeks for mental health issues . . . ." *See* Dr. Ifedoria's January 19, 2009 notes which are included in Pltf's Ex. No. 3. This means the guards in the east isolation unit *knew* that Plaintiff was battling mental health issues — otherwise he would not have been "under observation." It is hard to imagine how those guards and nurses, *for three days*, could have turned a "blind eye" to the simply appalling and dangerous conditions that Plaintiff was exposed to in cell #1.

Once Warden White and the other administrators within the ADC were made aware of this incident, they ordered Internal Affairs to conduct a thorough investigation, which resulted in two guards being terminated. The Court credits the ADC for the prompt and decisive way it responded to this very serious incident and hopes the ADC has implemented rules and regulations aimed at ensuring that a similar incident is not allowed to ever happen in the future.

one of whom was using a billy club. Such a beating would have left obvious injuries and signs of trauma all over Plaintiff's body. None of the doctors who carefully examined Plaintiff on January 19, 2009 noted any signs of trauma consistent with Plaintiff having recently been severely beaten.

17.     Both Defendant Glasscock and Mr. Gibson offered strong and credible testimony that Defendant Glasscock never used any force against Plaintiff while he was incarcerated in cell #1 of the east isolation unit.

18.     Nothing in these findings should be construed to mean that the Court believes Plaintiff intentionally fabricated a story about being beaten by Defendant Glasscock.  The Court finds that Plaintiff's schizophrenia caused him to become delusional and to believe he had been beaten by guards when, in fact, no such beating ever took place.  *Given the physical and mental challenges Plaintiff faced, between January 16 and 19, he is in no way responsible for having the delusional beliefs that led him to file this lawsuit.*

19.     The Court finds that Plaintiff has failed to prove by a preponderance of the evidence that Defendant Glasscock used *any force* against him, much less excessive force. The Court further finds that the greater weight of the evidence establishes that, at the time of the alleged beating, Plaintiff was delusional and psychotic. As a result, Plaintiff deluded himself into believing that he had been

brutally beaten by guards, when, in fact, no such beating took place.

### III. Conclusions of Law

1.       As a convicted prisoner, Plaintiff has the burden of proving under the Eighth Amendment that Defendant Glasscock used force "maliciously and sadistically to cause harm," rather than in "a good-faith effort to maintain or restore discipline." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992); *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008); *see also Whitley v. Albers*, 475 U.S. 312, 322 (1986) (holding that the evidence must support a "reliable inference of wantonness," and not "a mere dispute over the reasonableness of particular use of force or the existence of arguably superior alternatives").

2.       Because Plaintiff has failed to prove by a preponderance of the evidence that Defendant Glasscock used any force against him, the Court need not proceed to analyze the factors that must be considered in deciding if the use of force was "reasonable."  *See Walker v. Bowersox,* 526 F.3d 1186 (8th Cir. 2008); *Johnson v. Blaukat*, 453 F.3d 1108, 1112 (8th Cir. 2008).  Accordingly, Plaintiff has failed to prove his excessive force claim against Defendant Glasscock.


IT IS THEREFORE RECOMMENDED that Judgment be entered in favor of Defendant Glasscock.

23

Dated this 16th  day of March, 2012.

_____
UNITED STATES MAGISTRATE JUDGE